### SEYMOUR and SAGE *vs.* HENRY M. LEWIS and others.

Where the owner of a spring lot, and of a paper mill on another tract, by an artificial arrangement conveys the water to the mill, and then sells the spring lot, the purchaser takes it subject to the burthen.

The principle is, that where the owner of two tenements sells one of them, the purchaser takes the tenement, or portion sold, with all the benefits and burthens which appear at the time of the sale to belong to it, as between it and the property which the vendor retains.

*Richey* and *Beasley*, for complainants.

*Wilson*, for defendants.

THE CHANCELLOR. In the year 1857, James Gaunt was seized in fee and possessed of two lots or parcels of land and real estate in the city of Trenton. The first consisted of an extensive and valuable paper mill, with the water privileges and appurtenances, situate on the raceway of the Trenton Water Power Company, and known as the Delaware mill. The second consisted of a lot of land on the south side of Front street, extending in the rear to Washington street, upon which were erected two brick dwellings. Upon the latter lot there was a valuable spring, which furnished a copious supply of water. The water of the spring had been, by a previous owner of the two lots, as early as 1845, (and probably as early as 1841) diverted, by means of pipes or conduits, from its natural and accustomed channel over the land to the Assanpink creek, to the paper mill upon the other lot of Gaunt, and was there used in the manufacture of paper. The water continued to be thus diverted and used by all the successive proprietors of the two lots down to the year 1857. It was so used and enjoyed by James Gaunt during his ownership and occupancy of the two lots. During that year Gaunt became insolvent. By a deed, dated on the 31st of August, 1857, he conveyed the two houses and lot on Front street to his father-in-law, Griffen Green. On the 26th of September, 1857, he leased the paper mill to the complainants, Seymour and Sage, for the term of two years, and on the 28th of the same month he executed to them a mortgage upon the paper mill to secure the payment of $40,000 with interest.

On the 2d of November, 1857, a writ of attachment issued out of the Supreme Court, at the suit of Hiram A. Briggs and Russell Briggs, to the sheriff of the county of Mercer, against the real and personal estate of James Gaunt and James T. Derrickson, as nonresident debtors, by virtue of which the sheriff attached, inventoried, and appraised the paper mill alone. The lot on Front street was not included in the inventory.

On the 11th of November, 1857, a writ of attachment issued out of the Supreme Court to the sheriff of the county of Mercer, at the suit of Henry M. Lewis, against the real and personal estate of James Gaunt, as a nonresident debtor, by virtue of which the sheriff attached, inventoried, and appraised both the paper mill and the houses and lot on Front street. This latter attachment is still pending undisposed of.

In the attachment issued at the suit of Briggs against Gaunt and Derrickson judgment was recovered, upon the report of auditors, in favor of divers creditors, to an amount exceeding $85,000, including a claim of the complainants, Seymour and Sage, against Gaunt alone, to the amount of $50,965.75, and the auditors were directed to make sale of the property attached. At a sale made by the auditors, on the 29th day of July, 1859, Seymour, one of the complainants, for the benefit of the firm, became the purchaser of the paper mill, with the privilege of diverting the water from the spring to the paper mill, and also of the houses and lot on Front street. The property was conveyed to him, accordingly, by deed dated on the 9th of September, 1859. The complainants, by virtue of their lease and of the title thus acquired by them, continued in possession and enjoyment of the paper mill and of the spring of water down to the time of filing their bill.

Lewis claims title to the lot on Front street, and also to the spring of water, with the right of diverting it from the complainants' mill by virtue of a deed from Griffen Green, bearing date on the 5th of May, 1859.

The bill prays that the deed from Gaunt to Griffen Green, and from Green to Lewis, may be declared to be fraudulent and void, or that they shall stand as securities for the sums actually advanced to Gaunt as a consideration for the conveyance; that Lewis may be enjoined from using the title as a defence to an ejectment brought by Seymour for the recovery of the said lot, and that he

may be also restrained from diverting or obstructing the flow of water from the spring to the complainants' mill.

Upon the facts disclosed by the pleadings, and established by the evidence in this cause, the complainants have an unquestioned title to the paper mill, with the appurtenances. The defendant has the legal title to the lot in Front street. Assuming the title from Gaunt to Griffen Green, under which the defendant claims, to be valid and operative, the material question in the cause is, whether the right to water flowing from the spring passed with the title of the lot upon which the spring is situate, or whether it remained in the grantor as an appurtenance of the mill. The water of the spring was diverted from its natural channel, and was conveyed to the mill, to be used in the manufacture of paper by a former proprietor of both lots, at least as early as the year 1845. The water was carried from the spring to the mill, a distance of eight or nine hundred feet, by means of iron pipes or conduits laid under ground. The diversion of the water was effected by the proprietor, at a great expense, for the exclusive benefit of the mill. It continued to be so used and enjoyed by the successive proprietors of the two lots for several years, and so long as the title of the two lots were united in the same person. It was so used and enjoyed by James Gaunt at the date of the conveyance of the Front street lot to Griffen Green, on the 31st of August, 1857. The deed is in the usual form of a deed of bargain and sale, and contains no express reference to the spring, or the water flowing from it, either by way of grant or reservation. The complainant insists that the grantee took title to the Front street lot, upon which the spring is situate, subject to the easement of the flow of water to the mill, as it was used and enjoyed by the owner at the date of the conveyance.

In an elementary treatise of deservedly high reputation, it is said that the implication of the grant of an easement may arise upon a severance of an heritage by its

owner into two or more parts.    Upon the severance of an
heritage a grant will be implied—first, of all of those con-
tinuous and apparent easements which have in fact been
used by the owner during the unity, though they have
had no legal existence as easements; and secondly, of
all those easements without which the enjoyment of the
several portions could not be fully had.    *Gale and Whatly
on Easements* 49.

The rule of the French law upon this subject, with the
incidents of which the common law is said to agree, is
thus laid down in the French civil code.    "If the pro-
prietor of two estates, between which there exists an
apparent sign of servitude, disposes of one of these estates
without inserting in the contract any stipulation relative
to the servitude, it continues to exist actively or passively
*in favor* of the land alienated or *over* the land alienated.
*Code Napoleon, book* 2, *tit.* 4, § 694.

Does this principle prevail at common law?

In the very recent case of *Lampman* v. *Milks*, 7 *Smith*
507, Justice Selden, in delivering the opinion of the
Court of Appeals of New York, said, "The rule of the
common law on this subject is well settled.    The princi-
ple is, that where the owner of two tenements sells one
of them, or the owner of an entire estate sells a portion,
the purchaser takes the tenement or portion sold with all
the benefits and burthens which appear at the time of the
sale to belong to it, as between it and the property which
the vendor retains.    This is one of the recognised modes
in which an easement or servitude is created.    No ease-
ment exists so long as there is a unity of ownership, be-
cause the owner of the whole may at any time rearrange
the qualities of the several parts.    But the moment a
severance occurs by the sale of a part, the right of the
owner to redistribute the properties of the respective por-
tions ceases, and easements or servitudes are created cor-
responding to the benefits and burthens mutually existing
at the time of the sale."

The principle thus clearly stated is fully sustained by the current of authority, both ancient and modern. *Robbins* v. *Barnes, Hobart* 131; *Nicholas* v. *Chamberlain, Cro. Jac.* 121; *Cox* v. *Matthews,* 1 *Vent.* 237; *Palmer* v. *Fletcher,* 1 *Levinz* 122; *S. C.* 2 *Sid.* 167; *Shury* v. *Piggot,* 3 *Buls.* 339; *Brakely* v. *Sharp,* 2 *Stockt.* 206; *Hazard* v. *Robinson,* 3 *Mason* 272; *United States* v. *Appleton,* 1 *Sumner* 492; *New Ipswich Factory* v. *Batchelder,* 3 *New Hamp.* 190; *Kilgour* v. *Ashcom,* 5 *Harr. & Johns.* 82.

It is admitted that this doctrine applies in its fullest extent in support of all easements claimed by the grantee of that part of the premises first sold by the common owner. Thus it is said, if Gaunt had retained the lot upon which the spring is and conveyed the mill, the right to use the water would have passed by the conveyance as appurtenant to the mill; but having retained the mill, and conveyed the lot upon which the spring is, the spring passes by the grant, and the grantor, or those claiming under him, cannot claim the easement of having the water for the use of the mill, for that would be in derogation of the grant. There is no doubt that several of the reported cases are made to rest upon this ground, and the principle may be safely invoked against the grantor in support of the broader right arising from the actual condition of the premises at the time of the severance of the ownership. But there are cases which do not rest upon this principle, nor can it be invoked in their support.

Thus in regard to what are termed easements of necessity, as where a man grants land in the middle of his field, the easement of a right of way across the grantor's land is said to flow by necessity from the grant. But if the grantor conveys the surrounding land, reserving to himself the centre of the field, he has the easement of a right of way across the land of the grantee. 2 *Bouvier's Inst.* 190.

So where land held in unity is partitioned, either by the voluntary consent of the parties or by judicial pro-

ceeding, the owner of each share will take his part sub-
ject to all the burthens which were imposed and all the
advantages conferred by the prior owner. In *Kilgour* v.
*Ashcom*, 5 *Harr. & Johns.* 82, the action was brought for
overflowing the plaintiff's land by a mill dam in the occu-
pancy of the defendant. The land of both parties had
previously belonged to one John Keech, who died intes-
tate, and the land was partitioned by the authority of the
Orphans Court among his heirs. The parties, plaintiff
and defendant, held, respectively, the shares of the
children. Upon the defendant's share was a mill, the
dam of which threw the water upon the plaintiff's land.
A small part of the dam was also upon his land. The
court say the mill and the dam were at the time of bring-
ing the suit in the same situation in which they had been
left by John Keech, and had been held by him in his
lifetime, and the question is, whether Samuel Keech and
those claiming under him have a right to use them in the
same way and to the same extent, and it is clear that they
have. The children of John Keech took their respective
proportions of their father's estate in the same condition
and subject to the same advantages and disadvantages
under which he held it.

In *Brakely* v. *Sharp*, (1 *Stockt.* 1, 2 *Stockt.* 206,) in this
court, the same principle was maintained by the Chan-
cellor, after a very full discussion and elaborate examina-
tion of the authorities. In that case the owner of a farm,
upon which there was a spring of water, conveyed the
water from the spring to two dwelling houses upon the
premises. The owner died intestate. That part of the
land upon which were the spring and one of the dwellings
was assigned, by order of the Orphans Court, to the
widow and one of the heirs. The part of the farm on
which the other dwelling was, was sold by the commis-
sioners under the order of the Orphans Court, and came,
by sundry mesne conveyances, to the complainant. The
bill was filed to protect him in the enjoyment of the water

flowing through the pipe to his dwelling. It was held by the Chancellor that the aqueduct and the right to use the water, as it was held and enjoyed by the former owner, being essential to the beneficial enjoyment of the premises, vested in the complainant, and a perpetual injunction was granted to protect him in the enjoyment.

These cases show clearly that an easement may be created by the disposition made by the owner of an estate, and that upon the severance of title the owners will take their respective shares as they existed in the hands of the former owner. It was held, however, in the latter case, though the opinion was not essential to the decision of the cause, that if the owner himself had severed the unity of title he could not claim the easement upon the land on the ground that it would be derogating from his own grant.

In Nicholas v. Chamberlain, Cro. Jac. 121, which is one of the earliest cases on the subject, it was held by all the court, that if one erect a house, and build a conduit thereto in another part of his land, and convey water by pipes to the house, and afterward sell the house with the appurtenances, excepting the land, or sell the land to another, reserving to himself the house, the conduits and pipes pass with the house, because it is necessary and quasi appendant; and he shall have liberty by law to dig in the land for amending the pipes, or making them new, as the case may require.

The question in this case came up upon demurrer, and it does not appear whether the house or the vacant land had been conveyed. But the court treat that as a matter of perfect indifference. In either event the conduit and pipes go with the house. This case has never been overruled, but has often been cited with approbation. Hazard v. Robinson, 3 Mason 279; United States v. Appleton, 1 Sumner 502; Lampman v. Milks, 7 Smith 508; New Ipswich Factory v. Batchelder, 3 New Hamp. 190.

In the last case, the Chief Justice, in delivering the

opinion of the court, after citing the case of *Nicholas* v. *Chamberlain*, says, "The rule here laid down seems to us to be founded in sound reason and good sense."

In *Palmer* v. *Fletcher*, 1 *Lev.* 122, the case was, a man erected a house on his own lands, and afterwards sold the the house to one, and the lands adjoining to another, who obstructed the lights of the house. It was held that neither the builder nor any purchaser under him could obstruct the lights, on the ground that the grantor could not derogate from his grant. Kelynge, J., said, if the vacant ground had been sold first, and the house afterwards, the purchaser of the ground might then have stopped the lights. Twisden, J., to the contrary, said, whether the land be sold first or afterwards the vendee of the land cannot stop the lights of the house in the hands of the vendee or his assignees. The rule, as declared by Twisden, is now the well settled rule of the English law. *Riviere* v. *Bower*, 1 *Ryan & Moody* 24.

In the recent case of *Lampman* v. *Milks*, 7 *Smith* 507, already referred to, the court say, "This is not a rule for the benefit of purchasers only, but is entirely reciprocal. Hence, if instead of a benefit conferred, a burthen has been imposed upon the portion sold, the purchaser, provided the marks of the burthen are open and visible, takes the property with the servitude upon it. The parties are presumed to contract in reference to the condition of the property at the time of the sale, and neither has a right, by altering arrangements then openly existing, to change materially the relative value of the existing parts."

The subject is carefully considered in the elementary treatise already referred to, and the rule, the ground upon which it rests, and the limitations to which it is subject, are thus stated: "To clothe with right this permanent alteration of the qualities of two heritages the consent of the owner of the servient tenement, in the manner appointed by law, is necessary ; but where the land benefited and the land burthened belong to the same owner, he

may change the qualities of its several parts at his will, and his express volition, evidenced by his acts, must at least be as effectual to impress a new quality upon his inheritance as the implied consent arising from his long continued acquiescence."—"It is true that, strictly speaking, a man cannot subject one part of his property to another by an easement, for no man can have an easement in his own property, but he obtains the same object by another right, the general right of property; but he has not the less thereby permanently altered the quality of the two parts of his heritage, and if, after the annexation of peculiar qualities, he alien one part of his heritage, it seems but reasonable, if the alterations thus made are palpable and manifest, that a purchaser should take the land burthened or benefited, as the case may be, by the qualities which the previous owner had undoubtedly the right to attach to it."—"The reasoning applies to those easements only which are attended by some alteration which is in its nature obvious and permanent, or, in technical language, to those easements only which are apparent and continuous, understanding by apparent signs not those which must necessarily be seen, but those which may be seen or known on a careful inspection by a person ordinarily conversant with the subject." *Gale and Whatley on Easements* 51, 53.

Every grant of a thing (says Mr. Justice Story) naturally and necessarily imports a grant of it as it actually exists, unless the contrary is provided for. *United States* v. *Appleton*, 1 *Sumner* 502.

At the time of the grant of the Front street lot from Gaunt to Griffen Green the stream was diverted from its natural course through the land granted by an artificial channel to the mill of the grantor. The grantee took the land as it then stood with the water diverted from it. *Lampman* v. *Milks* is an express authority that the grantor could not return the water to its natural channel against

the consent of the grantee. The grantee has a right to insist that it shall be continued as it was at the date of the grant, viz. in the artificial channel. He cannot have a right to elect in which channel it shall go. If the grantee have a right to insist upon its being continued in the artificial channel, the grantor must have an equal right to keep it there.

The easement in question, being apparent and continuous in its character, comes within the operation of the principle. The water flows naturally and continuously from the spring to the mill, the fall between the two points being about one foot. Owing to the length of the pipe, and the consequent obstruction to the flow of the water, it was found that the full benefit of the spring was not obtained. The owner, therefore, to overcome the difficulty, applied the pump, driven by machinery, directly to the pipe, and thus obtained the full advantage of the supply of water. It has thus been used nearly from the time that the pipes were first introduced.

Nor is the right of the parties at all affected by the grant of the right of diverting the water made by Gaunt to Griffen Green. It is somewhat difficult to discover the purpose of that conveyance. Viewed in regard to its apparent object, it is manifestly inoperative. In 1825, Harding, who owned the mill and the lot on Front street upon which the spring is, purchased of the owner of the land lying between the spring and the Assanpink creek an additional lot, lying between the spring and Washington street, together with the perpetual right of diverting to the paper mill of the grantee or elsewhere all waters rising or flowing over or from the land granted, so that it should not flow over the land of the grantor in its usual and accustomed course to the Assanpink creek. Harding acquired thereby the title to the land and the *easement* of diverting the water from its usual and accustomed channel across the land of the grantor to the As-

2 P*

sanpink creek. Easements are not rights distinct from the title of the land. They are imposed upon corporeal property for the benefit of corporeal property. To constitute an easement there must be two distinct tenements, the dominant, to which the right belongs, and the servient, upon which the obligation is imposed. *Gale and Whatley on Easements* 5; 2 *Bouvier's Inst.* 170.

By virtue of the conveyance to Harding, the spring lot became the dominant tenement, and acquired the easement of diverting the water from its accustomed channel to the Assanpink over the land of the grantor, which was subjected to the charge of losing the flow of the water. It passed with the title of the land itself. It could not exist separate from it. It was not annexed to the person of the owner. The title to the land could not be in one person, and the easement or right of diversion in another. When, therefore, the Front street lot was granted by Gaunt to Griffen Green the easement, or right to divert the water from its course over the adjacent lot to the Assanpink creek, passed with it. Now that is the easement which in terms this deed professes to grant, *viz.* the right of diverting the water so that it shall not flow over the intervening land into the Assanpink. For that purpose, as has been said, the grant is inoperative, because the easement had already passed by the grant of the land.

But it was suggested, upon the argument, that the effect of the grant was to authorize the diversion of the water from the paper mill. Such clearly is not the legal effect of the instrument. In very terms it authorizes the water to be diverted *to* the *paper* mill or elsewhere, as against the claims of the servient tenement, but not as against any other adverse right. The deed, I think, never could have been construed, as against Gaunt himself, into a grant of a right appurtenant to the paper mill, and destructive of the value of that property.

But, however this may be as against the mortgagee and

attaching creditors of the mill property, it is clearly inoperative.

The clear weight of the evidence is, that the deed was neither executed nor delivered at the time it bears date, nor until the 23d day of January, 1858, the day upon which it was acknowledged. It was not recorded until the 7th of April, 1859. It could therefore affect no right of the mortgagee or attaching creditor, which were acquired long before. Viewed as a grant of a right to divert the water from the paper mill it was clearly a conveyance of property, which must have been recorded to give it priority over the rights of the attaching creditors.

The complainant further insists that the deed from Gaunt to Griffin Green, under which Lewis claims title, is fraudulent and void as against creditors, and that he has acquired a valid title to the premises under the attachment by virtue of the auditor's deed.

The writ of attachment under which the complainants claim title was not executed upon the Front street lot. That lot was not specified in the inventory and appraisement. No lien was acquired thereon by virtue of the writ, and the auditor's deed was inoperative to give title.

The evidence in the cause tends strongly to prove that the conveyance of the Front street lot from Gaunt to Green was not a *bona fide* sale, but was either fraudulent or intended as a collateral security for accommodation paper previously furnished by the grantee to the grantor. The answer of Lewis states that the nominal consideration of the deed, $5000, was paid as follows: $1666 in cash, and the balance of $2334 in two promissory notes at six months, one for $1666 and the other for $1668. The whole transaction, upon its very face, is in the highest degree unnatural and improbable. The grantor aliens the land and puts the purchaser in possession, taking in payment for two-thirds of the consideration money the promissory notes of the vendee, who is shown to be totally irresponsible, and who in fact never advanced one

dollar on account of them. The amount of the notes was raised by a sale of the lot after Gaunt's death.

One of the notes is dated on the 13th of July, the other on the 18th of August, and both are payable six months after date. The deed is dated and executed on the 31st of August. They wear all the appearance of being mere accommodation paper. Green, the maker, declared that they were so, and that he never received any consideration for them. The account given of the payment of the balance of the purchase money is far from being satisfactory. It rests entirely upon the testimony of Green himself, who was a deeply interested witness, and is uncorroborated by a single circumstance. The answer of Lewis upon this point is of no value, for it is stated to be, as it obviously was, upon information merely. If to these circumstances be added the alleged grant of the right to divert the water from the mill and the lease of the water for two years from Green to Gaunt, for the use of the mill, the character of the transaction stands out in strong colors. The grantor, on the eve of insolvency, conveyed to his father-in-law two houses and a lot, which are proved to be worth $5000, and which were paying an annual rent of $300, together with the right to divert from a large and valuable paper mill a stream of water which was essential to its successful operation, and the lowest estimated value of which to the mill owner was $5000, for the nominal consideration of $5000, and receives in return $1666 in cash and two promissory notes of the vendee, who was totally irresponsible, for $2334, which were never paid by the grantee. It is hazarding little to assert that no such transaction ever was or could have been made in good faith.

As between the creditors of Gaunt, the grantor and the grantee, the conveyance must have been set aside as fraudulent or treated as a mere security for the amount actually advanced by the purchaser. But Lewis, the pre-

Seymour *v.* Lewis.

sent defendant, stands upon different ground. He paid a full and fair consideration for the premises independent of the claim to the water right. There were certainly circumstances within his knowledge calculated to put him upon inquiry as to the character of the title of his grantor. Lewis no doubt at one time regarded the deed to Griffin Green as fraudulent, and acted upon that belief. On the other hand, the attaching creditors did not levy their attachment upon the property in question, thereby treating the conveyance to Green as valid. These complainants treated the conveyance as valid. They sued out an attachment against Green, and caused it to be levied upon the lot in question, and were proceeding to sell it in payment of the notes alleged to have been given by him as part of the purchase money. Under those circumstances, the lot being about to be sold under the attachment at the suit of these complainants as the property of Green, Lewis purchased for a fair price, and paid more than two-thirds of the purchase money to the complainants themselves in discharge of their claim against Griffin Green. Under such circumstances, the complainants do not stand in a position in a court of equity, either in their own right as creditors of Gaunt or under color of the right of other creditors, to contest the validity of Lewis' title.

The objection to the bill on the ground of multifariousness is not sustained. The sole design of the bill was to draw in question the validity and effect of the complainant's title to the Front street property. The whole ground of controversy is with one defendant, virtually by the same plaintiff, and respecting one subject matter. The objection is not raised either by the answer or by demurrer. There is nothing in the case to create embarrassment or perplexity in settling the rights of the parties.

The prayer of the complainant's bill, so far as it seeks to set aside the title of Lewis to the Front street lot, must

be denied. The injunction restraining him from offering the title in evidence as a defence to the complainant's action at law must be dissolved. The injunction restraining him from diverting the water of the spring upon said lot from the complainant's paper mill, and from interfering with the flow thereof, as heretofore used, must be made perpetual. The decree will be made without costs against either party.